## WARD v. HELIS.*
### No. 8725.

Circuit Court of Appeals, Fifth Circuit.

March 24, 1939.

SIBLEY, Circuit Judge, dissenting.

———◆———

Wm. N. Bonner, of Houston, Tex., W. D. Gordon, of Beaumont, Tex., and Andrew R. Martinez, of New Orleans, La., for appellants.

Lloyd J. Cobb and Morris Wright, both of New Orleans, La., for appellee.

Before SIBLEY, HOLMES, and Mc-CORD, Circuit Judges.

McCORD, Circuit Judge.

In the year 1935 the Iberia Oil Corporation and Y. D. Spell owned a seven eighths working interest in a mineral lease covering sixty acres of land in the Little Bayou Oil Field in Iberia Parish, Louisiana. On February 6, 1935, the oil company and Spell entered into a written option agreement with William Helis whereby the said Helis was given the right to purchase their interest in the mineral lease. The option contract was prepared jointly by the contracting parties and their respective counsel in the office of the seller. A day and the greater part of a night was consumed in drafting the agreement and much was written and said by the parties and many changes were made before the contract was finally agreed upon and signed.

At the time of the execution of the option contract Iberia Oil Corporation and Y. D. Spell had a producing oil well on their property. This well was known as Bernard No. 1. They were also engaged in drilling another well known as Bernard No. 2. Under the terms of the option agreement Helis agreed to drill at his own expense a third well on the property to be known as the Bernard No. 3.

The price which Helis agreed to pay for the mineral lease, in the event he exercised his right to purchase, was to be in

\* Rehearing denied 103 F.2d 519.

accordance with the following provisions of the said contract:

"3. At any time prior to the expiration of the options herein granted, Second Party (Helis) shall have the right to purchase the afore-described mineral lease and all rights thereunder, including all oil produced from the Bernard No. 1 well from the date of completion of the Bernard No. 2 well, as follows:

"(a) In the event the Bernard No. 2 well or the Bernard No. 3 well should be brought in as producers the purchase price of the leasehold interest shall be $300,000.00 if the average daily production of said wells for a period of fifteen days after completion is less than 3000 barrels each, calculated on a $\frac{3}{8}$-inch choke according to the methods usually employed in gauging the capacity of oil wells.

"(b) In the event either the Bernard No. 2 or the Bernard No. 3 well should be brought in capable of production (producing) more than 3000 barrels per day, calculated as above set forth, then the purchase price shall be $400,000.00.

"The purchase prices above set forth shall be paid, fifty per cent in cash as provided herein, and fifty per cent out of $\frac{1}{4}$th of $\frac{7}{8}$ths of the proceeds derived from the production from all wells drilled and hereafter drilled on the said property.

* * * * * *

"5. Within two days after the expiration of the test period of fifteen days following the completion of the Bernard No. 3 well drilled by Second Party, said Second Party shall elect to accept or reject the applicable option to purchase herein granted, and such acceptance or rejection shall be by registered mail addressed to Iberia Oil Corporation, Inc., at 1706 Sterling Building, Houston, Texas, and Y. D. Spell, 2215 Blanchette Street, at Beaumont, Texas. Failure of Second Party to give the required notice shall be deemed to be a rejection of the options granted, and Second Party shall have no further rights hereunder, and said Bernard No. 3 well shall become the sole property, of First Parties."

The evidence discloses that after the option contract was signed, the parties and their counsel, after discussion, drafted jointly and the parties signed the following addendum contract: "Houston, Texas, February 6, 1935. It is agreed by the undersigned that the test provided for in paragraph 3 of the agreement between them of even date shall be made jointly by one representative of Iberia Oil Corporation and Y. D. Spell and a representative of Wm. Helis; and in the event they fail to agree on the proper gauge on the well or wells, Judge Harden, of the firm of Pujo, Harden & Bell, will appoint a reputable engineer to act as umpire."

Iberia Oil Corporation drilled Bernard No. 2 into a salt formation; it failed to produce oil and was abandoned as a dry well.

Helis drilled Bernard No. 3 and on April 21, 1935, it was brought in as an oil producer. This well has proved to be one of the largest oil producing wells in Louisiana. From April 29, 1935, to December 31, 1936, 1,802,565.32 barrels of oil was taken from the lease and nearly all this amount was produced by the Bernard No. 3 well. For many months this well actually produced more than three thousand barrels of oil per day.

After Bernard No. 3 was brought in as a producer, Helis exercised his right under the option agreement and gave notice to the oil corporation and Spell that he elected to purchase the property. Without a test being made the sellers contended the price to be $400,000 and Helis contended it to be $300,000. The oil corporation and Spell called for a test of the well as provided for under the addendum contract and Helis agreed to join in the test. When the time arrived for the test Helis failed and refused to carry out his agreement and the test was made alone by the sellers' representative, E. O. Buck, a consulting petroleum engineer.

On a further proposed test of the well Helis again declined to name a representative and, through his counsel, bitterly protested the naming of an umpire by Judge Hardin, contending that he was interested and prejudiced. The evidence shows that Judge Hardin was in no wise interested or prejudiced; that he was fair and forthright, and that he had even gone so far as to call upon Helis' counsel to suggest the name of an engineer who could and would act as umpire. Counsel failed to suggest an engineer. Judge Hardin carefully followed the instructions given him by counsel for Helis by instructing W. L. Massey, an expert petroleum engineer whom he had appointed as umpire, to determine "first, the actual production of three-eighths ($\frac{3}{8}$) choke; second, by using the three-eighths ($\frac{3}{8}$) choke you are

to calculate the open flow capacity of the well".

Although the engineer Buck had tested the well previously, he joined Massey and together they made a test of the well and gave to each of the contracting parties a detailed report of their findings. Not one word of criticism, so far as we are able to find, was leveled at the work and findings of these engineers. The evidence shows them to be efficient, accurate and thorough, and although they were handicapped by lack of cooperation and the actual interference of Helis' employees, they made a thorough test and detailed report of their findings. The report of Massey, which was concurred in by Buck, informs that, "I find that said Bernard No. 3 well is capable of flowing merchantable oil at a rate much in excess of 3,000 barrels of oil per day on an open flow, or through any choke larger than a $\frac{5}{8}$" choke".

The sellers demanded that they should be paid $400,000 for their property. Helis still insisted that the price should be $300,000, but nevertheless, called upon the sellers for a deed and agreed to pay the higher amount, under protest and with reservation of his rights under the agreement. He insisted further that in paying the larger amount it should apply to whichever price was actually due and payable.

The sellers thereupon forwarded to the Bank of Commerce in New Orleans an assignment of the mineral lease, together with two drafts, one for $215,530.34 and another for $1,918.90. The purchase price of the lease was payable 50 per cent in cash and the balance out of the oil to be produced. The draft for $215,530.34 represented fifty per cent of the maximum purchase price plus other amounts claimed to be due as costs incurred in drilling the Bernard No. 2 well. This surplus amount and the draft for $1,918.90 are not before us for consideration or decision.

On May 13, 1935, Helis paid the drafts, received and accepted the assignment of the lease and immediately recorded the same in the conveyance records of Iberia Parish, Louisiana. Upon paying the money into the bank he immediately attached and seized the entire amount. He immediately instituted an attachment suit in the Civil District Court of the Parish of Orleans to recover the $50,000 which he claimed to be the difference between what he considered the correct cash portion of the purchase price, namely, $150,000, and the amount of $200,000 which he actually tendered for the assignment deed. Later he went into court and released all the funds seized except the $50,000. The attachment suit was thereafter removed to the Federal District Court and was later voluntarily dismissed by Helis.

The sellers, by leave of the court, amended their answer and the same was taken as a cross petition and the cause was thereby further maintained in the district court over the strenuous objection of Helis, the sellers becoming the petitioners.

The Iberia Oil Corporation was dissolved and on May 3, 1935, its two thirds interest in the Bernard lease was purchased by A. L. Mitchell, Bryan Ward, and A. B. Mhoon, and its liability under the Helis contract was assumed by them. Bryan Ward died in 1937 and Mrs. Itasca Kinney Ward was named executrix of his will, and by order of the court she was made a party to this suit.

The suit in the court below was one finally heard on the petition of Ward, Mitchell, Mhoon, and Spell. The petitioners sought to have the contract abrogated and an accounting ordered, or, failing in this, they sought to recover the sum of $100,000 as the balance owing on the sale contract. On a hearing the court below, in equity without a jury, found the issues in favor of William Helis and dismissed the petition. The petitioners now bring their appeal to this court.

Our decision must turn upon the following questions: (1) Is the purchase price of the property to be determined by the amount of oil that can be produced by the well in a day through a $\frac{5}{8}$-inch choke? (2) Is the purchase price of the property to be determined by the amount of oil the well is capable of producing in a day?

The parties and their lawyers, we may conclude from the evidence, knew thoroughly the line of business in which they were engaged. Before the parties signed the purchase option agreement they spent hours going over the proposed terms of the contract. They made many changes before the agreement was finally approved and signed. Not being content with this agreement they came together again with their counsel on the same day and after

more discussion they drafted and the parties signed an addendum contract.

■ There is nothing ambiguous or complicated about the contract and its meaning. To find out what the well could produce a fifteen day test was provided. This is the test: "The average daily production * * * *calculated* on a ⅜-inch choke according to the methods usually employed in gauging the *capacity* of oil wells" or, as said in the next paragraph of the contract, the amount the well was "*capable of producing*" calculated as above set forth; that is, "calculated on a ⅜-inch choke".

The parties to this agreement were not children. They were experienced oil men. They were reinforced by counsel. They knew the oil business from every angle and they knew that there was not in all Louisiana an oil well that would produce 3000 barrels of oil per day through a ⅜-inch choke. The contract was not to measure the production through a ⅜-inch choke, but to calculate on a ⅜-inch choke the amount the well was capable of producing.

A child could stand at the well and measure the amount of oil that would come through a ⅜-inch choke in a day. The parties wanted more, they wanted to ascertain if the well was "capable of producing" more than 3000 barrels of oil per day. They provided a test to determine this capacity by calculation without subjecting the well to the hazards attendant to the open flow of a well. Much was staked on the agreement. A balance of many thousands of dollars was to be paid from the oil that was to come from this land. If the oil was not produced the sellers would not be paid. The parties well knew that to allow the well to run on open flow would impair the life of the well and in all probability destroy it. Men skilled in the oil business do not permit wells to run on an open flow and these parties knew it. It is not to be presumed that these parties intended to do a vain and useless thing. Clay v. Ballard, 9 Rob., La., 308, 41 Am.Dec. 328; 13 C.J. § 511, p. 540.

Of course the ⅜-inch choke of itself would not disclose the capacity, but by using it as a base, and building up therefrom by using other chokes to determine pressures and conditions, expert petroleum engineers could calculate accurately the amount of oil the well was capable of producing in a day. This calculation could be made without releasing the entire flow of the well and thereby endangering its life. We have only to turn to the reports of the two petroleum engineers: "To determine the correct physical condition of the well on a ⅜" choke, I conducted tests through ¼" choke, ⅜" choke, ½" choke, and for a few moments on a ⅝" choke." They find, to be sure, that the well would not produce over 3000 barrels of oil in a day through a ⅜-inch choke, but they tell us that by using the ⅜-inch choke and then building up therefrom, "I find that said Bernard No. 3 well is capable of flowing merchantable oil at a rate much in excess of 3000 barrels of oil per day on an open flow, or through any choke larger than a ⅝" choke".

To hold that the measure of oil passing through the ⅜-inch choke is the determining factor we must change the contract to read: "The average daily production * * * for a period of fifteen days * * * measured *through* a ⅜-inch choke." We must also cast away the provisions which call for the ascertainment of the amount the well is "*capable of producing, calculated as above set forth*".

The contracting parties knew how to measure oil flowing from wells. That was part of their business. No addendum clause was required for them to find out what oil would pass through a ⅜-inch choke in a day. This clause was put in for a real test to be made by experts in the event of a disagreement. If the parties had contemplated a simple measurement through a ⅜-inch choke they would have needed no addendum clause calling for expert engineers and an umpire. Their minds met on a test and not a measurement. Had a simple measurement been suggested at the time the contract was executed, we are of opinion that the parties would have scoffed it away knowing full well that no 3000 barrels of oil would pass through such a choke. Such a construction of the test is an afterthought and the learned trial judge fell into error in following it.

■ The defendant Helis is bound by the tests made by the petroleum engineers. These tests inform that he should pay the higher amount provided in the agreement, $400,000. . . . .

The court below will enter judgment for the appellants for their respective interests in the balance due under the contract, the same being $100,000 with legal interest thereon from May 13, 1935.

The judgment is reversed and the cause remanded for further proceedings' not inconsistent with this opinion.

Reversed and remanded.

SIBLEY, Circuit Judge (dissenting).

I cannot agree to the statement of the case made by the majority opinion, nor to the reversal of the judgment. The statement that Bernard well Number 3 "for many months actually produced more than three thousand barrels of oil per day" is unsupported by the record. During twenty months, six hundred days, 1,802,565 barrels were taken from the entire lease, an average of three thousand barrels per day, but wells No. 1, No. 3 and No. 4 were all producing it, and there is no evidence that No. 3 ever produced three thousand barrels any day. But what No. 3 did after the fifteen day test period named in the contract is unimportant. Whether it produced three thousand barrels or went dry would have no effect on the construction and application of the contract. Again, the attitude of Helis I do not think is fairly stated. He had men present at every test, who to be sure contended that it was only necessary to measure the oil produced through the ⅜″ choke on the well to make the required calculation, but did permit on the last test other chokes to be experimented with. As to Judge Hardin, he stated that he was considering an offer of employment by the seller in the apparently impending litigation. Helis correctly objected that he was disqualified to appoint the umpire, and also objected that there was no dispute about what the well could produce on a ⅜″ choke. The instruction given the umpire by Judge Hardin to "calculate the open flow capacity of the well" was not authorized by Helis, who always contended that the open flow had nothing to do with the matter. The difference between the parties is and has always been about the meaning of their contract.

The one side contends that the calculation called for, towit "the average daily production for a period of fifteen days after completion * * * calculated on a ⅜″ choke according to the methods usually employed in gauging the capacity of oil wells" means that the well is to run for some hours on several of the fifteen days on a ⅜″ choke and from the results obtained a calculation is to be made of what the average production in barrels would have been for the fifteen whole days. The other side contends that the meaning is to measure what the well would produce through a ⅜″ choke for the fifteen days and from that calculate what it would have produced during the fifteen days if not choked at all. Either is a possible meaning. The evidence 'indicates that a very high gas pressure and a very light oil would have to be encountered for three thousand barrels to be forced through a ⅜″ choke in twenty-four hours, and it is argued that the parties could hardly have meant that. On the other hand it is testified without dispute that it is impossible to calculate what a well would flow if unchoked by ascertaining what it flows on a ⅜″ choke alone. So it would be equally improbable that the contract called for an impossible calculation of that sort. The last test resorted to the use of several chokes, and a noting of the increase of flow and decrease of pressure as the choke was enlarged, from which an *opinion* was formed that on a ⅝″ choke or larger three thousand barrels per day could be produced. But the contract does not call for opinions, but a calculation, and a calculation "according to the methods usually employed in gauging the capacity of oil wells." These are the key words of the contract. If we learn what the usual method employed is, we know what the parties here meant. Appellants' own expert witness Buck, who represented them at all the tests, testifies entirely without contradiction, thus:

"Q. What is the usual accepted method of ascertaining the capacity of a well when it comes in in the Gulf Coast country? A. Along the Gulf Coast in Texas most wells are gauged through a ¼″ choke, Southwest Texas ⅜″choke, other parts of the State ½″ choke. * * *

"Q. How did you test the capacity of Bernard No. 3 well on a ⅜″ choke? A. By placing a ⅜″ choke in the tubing wing of the tree, closing the well off on the other wing of the tree, getting a back gauge on the battery of tanks, and getting a front gauge over a period of time to see how much the well produced over a period of time. * * *

"Q. Did you calculate the daily production on a ⅜″ choke? A. The daily pro-

duction was calculated by taking the first one hour flow and multiplying that by twenty-four; the second two hours flow and multiplying by twelve.

"Q. Isn't that the usual and customary method employed in the oil industry in getting the capacity of an oil well with a ⅜" choke? A. No, that is not. In gauging the capacity of a well on a ⅜" choke the common practice would be a four hour flow, preferably a twelve hours flow; and still another, taking the actual oil produced every twenty-four hours. There would be no calculation there at all, you have actual physical record of the number of barrels produced. * * *

"Q. What was the daily production calculated on a ⅜" choke? A. On a ⅜" choke on April 27 the well was producing at the rate of 51.79 barrels per hour—approximately 1233 barrels per day.

"Q. According to your calculation the daily production of the Bernard No. 3 well on a ⅜" choke, in accordance with the usual method in gauging the capacity of oil wells, was this figure you have just mentioned? A. That is what the well was producing that day through a ⅜" choke, producing at that rate."

No witness claimed that it was usual or customary to do what was afterwards done by direction of Judge Hardin, in an endeavor to form an opinion as to what a well would do on some other choke, or wide open. Buck on his first test did what was usual and customary in calculating the capacity of the well on a ⅜" choke and found it to be 1233 barrels per day. The contract made no mention of using any other choke or ascertaining capacity when wide open. It speaks of calculation, but calculation is necessary whenever oil is flowed into a receptacle, depending on the size and shape of the receptacle, to ascertain the barrels flowed in a day; and another calculation is necessary to reach the average for fifteen days. If a tank of known capacity is available the calculation may be simpler, but such might not be on hand the first two weeks after oil is struck. The trial judge correctly held that Buck's measuring the flow on a ⅜" choke for certain hours on three several days and from that calculating the flow for twenty-four hours and averaging the results was the method usually employed and that called for by the contract.